**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

BRIAN C. EPPS,                    ) Case No. CV 12-1771-JPR
                                  )
              Plaintiff,          )
                                  ) MEMORANDUM OPINION AND ORDER
        vs.                       ) AFFIRMING THE COMMISSIONER
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social            )
Security,                         )
                                  )
              Defendant.          )
                                  )

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security Supplemental Security Income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This matter is before the Court on the parties' Joint Stipulation, filed November 26, 2012, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

**II.  BACKGROUND**

Plaintiff was born on July 29, 1969.  (Administrative Record

1

("AR") 51.)  He has a ninth-grade education.  (AR 429.)  He has worked as a general laborer and sign exhibitor.  (AR 122.)

On June 10, 2009, Plaintiff filed his SSI application, alleging that he had been unable to work since December 1, 2006, because of bipolar disorder, leg pain, and back pain.  (AR 51-79.)  After Plaintiff's application was denied on initial review and reconsideration, he requested a hearing before an Administrative Law Judge ("ALJ").  (AR 37-47.)  A hearing was held on April 29, 2011, at which Plaintiff, who was represented by counsel, appeared and testified on his own behalf.  (AR 420-36.)  Medical Expert Steven Gerber and Vocational Expert ("VE") Alan Ey also testified.  (Id.)  In a written decision issued on July 14, 2011, the ALJ determined that Plaintiff was not disabled.  (AR 14-23.)  On January 10, 2012, the Appeals Council denied Plaintiff's request for review.  (AR 4-6.)  This action followed.

## III. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and are supported by substantial evidence based on the record as a whole.  § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504

F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. § 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of

impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. § 416.920(a)(4)(ii). If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 416.920(a)(4)(iii). If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis.

---

[1] RFC is what a claimant can still do despite existing exertional and nonexertional limitations. 20 C.F.R. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

§ 416.920; <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

    B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since June 10, 2009, the date of Plaintiff's application. (AR 16.) At step two, the ALJ concluded that Plaintiff had the severe impairments of bilateral femur fractures and schizoaffective disorder. (<u>Id.</u>) At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing. (AR 17-18.) At step four, the ALJ found that Plaintiff retained the RFC to

> lift twenty pounds occasionally and ten pounds frequently; sit for six hours and stand or walk for four hours, with normal breaks, during an eight-hour workday; only occasionally perform postural activities except never climb ladders, ropes, or scaffolds; only perform simple tasks with simple work-related decisions; and never interact with the general public and only occasionally interact with co-workers and supervisors.

(AR 18.) The ALJ found that Plaintiff had no past relevant work. (AR 21.) At step five, the ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform. (AR 22.) Accordingly, the ALJ determined that Plaintiff was not disabled. (AR 22-23.)

**V.   DISCUSSION**

Plaintiff alleges that the ALJ erred in failing to properly consider (1) the opinion of examining physician Concepcion A. Enriquez and (2) Plaintiff's subjective complaints. (J. Stip. at 4.)

A.   <u>The ALJ Did Not Err in Rejecting the Examining</u>
     <u>Physician's Opinion</u>

Plaintiff contends that the ALJ "improperly rejected" the opinion of examining physician Enriquez and instead relied on the opinion of the "non-examining state agency physician." (J. Stip. at 5-9.)

1.   <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." <u>Lester</u>, 81 F.3d at 830. In general, the opinion of a treating doctor is accorded more weight than the opinion of a doctor who did not treat the claimant, and the opinion of an examining doctor is, in turn, entitled to greater weight than the opinion of a nonexamining doctor. <u>Id.</u> (citations omitted); 20 C.F.R. § 416.927(c)(1)-(2).

An ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of a treating or examining physician. <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting <u>Lester</u>, 81 F.3d at 830-31). When such an opinion is contradicted, however, "it may be rejected for 'specific and legitimate reasons that are supported by substantial evidence in the record.'"[2] <u>Id.</u> (quoting <u>Lester</u>, 81

---

[2]   Although the legal standard governing rejection of either an examining or a treating physician's opinion is the same, because a treating physician's opinion is entitled to greater deference, "the type of evidence and reasons that would justify rejection of an examining physician's opinion might not

F.3d at 830-31).   An ALJ, moreover, "may reject the testimony of an examining, but non-treating physician, in favor of a nonexamining, nontreating physician when he gives specific, legitimate reasons for doing so, and those reasons are supported by substantial record evidence."   Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995) (citing Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995)); accord Ruiz v. Comm'r of Soc. Sec. Admin., No. 11-16162, ___ F. App'x ___, 2012 WL 5857135, at *1 (9th Cir. Nov. 19, 2012).   The weight given a physician's opinion depends on whether it is consistent with the record and accompanied by adequate explanation, among other things.   20 C.F.R. § 416.927(c)(3)-(6).

### 2.   Relevant facts

Sometime in 2005, Plaintiff was walking on railroad tracks and was struck by a train.   (AR 426.)   On June 16 and 29, 2005, Plaintiff underwent surgeries at UCI Medical Center to repair the soft-tissue injury on his right lower leg.   (AR 199-201.)   X-rays taken that day showed an "[o]pen comminuted fracture of the right femur with external fixation device in place" and "[n]o evidence of osteomyelitis."   (AR 195.)   On July 12, 2005, Plaintiff underwent a skin graft to his right-thigh wound.   (AR 197.)

On September 15, 2005, a California Department of Corrections ("CDC") radiology report noted that Plaintiff had an external fixation device through the proximal and distal right femur and a healing comminuted fracture of the distal one-third of the right femur.   (AR 203.)   On January 19, 2006, a CDC

---

justify rejection of a treating physician's opinion."   See Lester, 81 F.3d at 831 n.8.

clinician noted that Plaintiff's external fixation device had been removed on December 21, 2005, and he was ambulating with two crutches. (AR 207.) On January 25, 2006, a CDC clinician noted that Plaintiff was ambulating with two crutches and would be referred to physical therapy. (AR 206.)

On May 2, 2008, a nurse at the Orange County Jail noted that Plaintiff had reported "nerve damage" in his right leg resulting from a train accident and was requesting the medication Neurontin. (AR 255.) The nurse noted, however, that Plaintiff had a "steady gait," "good sensation" to his right extremity, and no difficulty sitting or standing. (Id.)

On January 13, 2009, a CDC clinician noted that Plaintiff had an infected wound on his right leg. (AR 393.) On February 11, 2009, a CDC clinician noted that Plaintiff had a 1.5-centimeter healing wound on his right thigh. (AR 392.) On February 25, 2009, x-rays of Plaintiff's right femur revealed no evidence of acute fracture but "[p]robable old distal femoral metaphyseal fracture with deformity," with "chronic superimposed osteomyelitis . . . not excluded." (AR 225.) On March 4, 2009, a CDC clinician noted that Plaintiff had a right-thigh wound and listed a "chrono" as no pulling, pushing, or shoveling over a certain weight.[3] (AR 391.)

On July 9, 2009, an SSA field-office staff member conducted a face-to-face interview with Plaintiff, noting that he suffered from "severe memory loss" but had no difficulty sitting,

---

[3]   The listed weight is illegible but appears to be two pounds. (See AR 391.)

standing, or walking, among other things.[4]  (AR 95.)

On September 10, 2009, Dr. Enriquez, who was "board eligible" in internal medicine, conducted an internal medicine consultation at the SSA's request.  (AR 332-35.)  Plaintiff reported his previous leg fractures and surgeries and said that he still had pain with "prolonged" standing and walking but that it was relieved by "resting and changing position."  (AR 332.) X-rays performed that day showed a metallic rod and old healed fracture deformity of the mid-shaft of the left femur; an old fracture deformity of the distal right femur, probably incompletely healed; and "minimal osteoarthritis" of the right knee.  (AR 336-38.)

On examination, Dr. Enriquez found that Plaintiff had "extensive scars" on his lateral right thigh, tenderness of the right knee, and a right lower extremity that was about 1.5 centimeters shorter than the left lower extremity.  (AR 334.) Plaintiff's right-knee range of motion was 130 out of 150 degrees of flexion, but ranges of motion of all other joints, including his hips, left knee, and ankles, were grossly normal.  (Id.) Plaintiff walked with a mild limp on the right but did not need an assistive device.  (AR 335.)  Plaintiff had normal muscle tone and bulk without atrophy, intact sensation, strength of "5/5 throughout" without focal motor deficits, and symmetrical reflexes of "4/4" throughout.  (AR 334.)  Dr. Enriquez noted that her findings were based on "formal testing as well as

---

[4]     The staff member apparently based his finding of memory problems on Plaintiff's stated inability to remember details about his employment or medical visits.  (AR 95.)

observation" of Plaintiff, but she did not indicate that she had
reviewed Plaintiff's medical records.  (AR 332-35.)  Dr. Enriquez
concluded that Plaintiff could lift or carry 20 pounds
occasionally and 10 pounds frequently, stand or walk for less
than one hour in an eight-hour workday, sit for six hours in an
eight-hour work day, and frequently bend, stoop, twist, squat,
crouch, and kneel.  (AR 335.)

On October 16, 2009, nonexamining agency physician Paulette
M. Harar reviewed all the evidence in Plaintiff's file and
completed a physical-RFC-assessment form.  (AR 339-45.)  Like Dr.
Enriquez, Dr. Harar found that Plaintiff could lift and carry 20
pounds occasionally and 10 pounds frequently, sit for six hours
in an eight-hour work day, and frequently perform all postural
activities, such as climbing, balancing, stooping, kneeling,
crouching, and crawling.  (AR 341-42.)  Unlike Dr. Enriquez,
however, Dr. Harar found that Plaintiff could stand or walk for a
total of about six hours in an eight-hour day.  (AR 341.)

Dr. Harar noted that her RFC finding was "significantly
different" from the RFC found by the examining physician, Dr.
Enriquez.  (AR 344.)  In a case-analysis form, which noted
Plaintiff's CDC x-rays and his stated daily activities, Dr. Harar
explained that "[g]iven that [Plaintiff] was observed by the
Field Officer to have no problems moving/sitting and given that
he has normal strength and bulk without atrophy and normal
sensation and only walks with a mild limp on the right," Dr.
Enriquez's suggested RFC of less than sedentary "appear[ed] a bit
restrictive."  (AR 371.)  Dr. Harar opined that an "RFC of light
appears more medically reasonable despite the heterotopic bone

formation in the right femur." (Id.) On April 29, 2010, another nonexamining agency physician, D. Chan, reviewed Plaintiff's medical records and affirmed Dr. Harar's RFC finding. (AR 394-95.)

On April 29, 2011, medical expert Dr. Steven Gerber testified at the hearing before an ALJ. (AR 424-25.) Dr. Gerber stated that he had reviewed the medical evidence and that Plaintiff had a history of bilateral femur fractures and obesity. (AR 424.) Like Drs. Enriquez, Harar, and Chan, Dr. Gerber opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pound frequently and sit for six hours of an eight-hour workday. (AR 425.) Unlike the other doctors, however, Dr. Gerber found that Plaintiff could stand or walk for four hours and could only occasionally perform postural activities. (Id.)

With regard to Plaintiff's physical abilities, the ALJ found, consistent with Drs. Enriquez, Gerber, Harar, and Chan, that Plaintiff had the RFC to lift 20 pounds occasionally and 10 pounds frequently and sit for six hours in an eight-hour workday. (AR 18.) The ALJ rejected Drs. Enriquez, Harar, and Chan's finding that Plaintiff could frequently perform all postural activities and instead adopted Dr. Gerber's more limited finding that Plaintiff could only occasionally perform those activities; "as an additional safeguard," he prohibited Plaintiff from ever climbing ladders, ropes, or scaffolds. (AR 18, 20.) Finally, the ALJ rejected Dr. Enriquez's finding that Plaintiff could stand or walk for less than one hour a day and Drs. Harar and Chan's finding that Plaintiff could stand or walk for six hours, instead adopting Dr. Gerber's finding that Plaintiff could stand

or walk for four hours.  (AR 18-20.)  In so finding, the ALJ noted that Dr. Enriquez "agreed with both Dr. Gerber and the State agency consultant in regard to lifting, carrying, and sitting but limited standing and walking to less than one hour and permitted only frequent stooping, kneeling, squatting, and twisting."  (AR at 19.)

   3.  <u>Analysis</u>

Plaintiff argues that the ALJ erred by rejecting the opinion of examining physician Dr. Enriquez in favor of those of the nonexamining state-agency physicians, apparently referring to Drs. Harar and Chan.[5]  (J. Stip. at 7-8.)  But the ALJ, after noting that he was giving Plaintiff "all reasonable consideration," actually assigned "great weight" to medical expert Dr. Gerber's "more restrictive opinion" and "correspondingly less weight" to Drs. Harar's and Chan's opinions.  (AR 20.)  Although the ALJ stated that he was giving "little weight" to Dr. Enriquez's opinion, it was largely consistent with Dr. Gerber's; they differed only in that Dr. Gerber believed Plaintiff could stand and walk for four hours in an eight-hour day and only "occasionally" perform postural activities, whereas Dr. Enriquez believed that Plaintiff could stand and walk for less than one hour in an eight-hour day and "frequently" perform postural activities.  Because Dr. Gerber's postural findings were actually more accommodating of Plaintiff

---

[5]  Plaintiff cites to Dr. Harar's and Chan's findings but does not address Dr. Gerber's.  (J. Stip. at 7 (citing AR 339-46 (Dr. Harar's physical-RFC assessment), 368-71 (Dr. Harar's case-analysis form), & 395 (Dr. Chan's case-analysis form).)

than Dr. Enriquez's, the only aspect of Dr. Enriquez's finding at issue here is her finding that Plaintiff could walk or stand less than an hour in an eight-hour workday.

The ALJ gave specific and legitimate reasons for rejecting Dr. Enriquez's standing-and-walking restriction in favor of Dr. Gerber's.  As the ALJ found, Dr. Enriquez's finding that Plaintiff could stand or walk for less than one hour conflicted with Plaintiff's own testimony and other statements.  (AR 19.) At the hearing, Plaintiff asserted that he could stand in one place for two or three hours if he "really struggle[d]" with it (AR 430) but later said that he could stand for about eight hours if he "really press[ed] it" (AR 433).[6]  In a function report, Plaintiff indicated that he traveled only by walking and went out every day to, among other things, shop in stores, which also undermines any finding that Plaintiff could stand or walk for only one hour of an eight-hour day.  (AR 116.)  That inconsistency with Plaintiff's own testimony was a specific and legitimate reason for rejecting Dr. Enriquez's standing-and-walking limitation in favor of Dr. Gerber's.  See Andrews, 53 F.3d at 1042 (upholding rejection of examining physician's opinion in favor of testifying medical expert's when medical expert's opinion was consistent with plaintiff's testimony, among other things); 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more

---

[6]     Plaintiff testified that he would be in pain if he stood for eight hours (AR 433), which would presumably be alleviated by Dr. Gerber's limitation to four hours of standing and walking in an eight-hour day (AR 425).

weight we will give to that opinion.").

The ALJ also found that Dr. Enriquez's "extremely restrictive assessment" of Plaintiff's standing-and-walking capabilities was inconsistent with her minimal findings on physical exam and the record as a whole. (AR 19.) Indeed, Drs. Harar, Chan, and Gerber each reviewed the evidence, including Dr. Enriquez's findings and opinion, and concluded that Plaintiff was capable of standing and walking for well over one hour.[7] (AR 341, 395, 425.) There is no indication, on the other hand, that Dr. Enriquez reviewed any of the medical evidence before rendering her opinion. The ALJ noted that the "only abnormalities" that Dr. Enriquez described in her report were "tenderness and slightly decreased range of motion in the right knee, a right lower extremity slightly shorter than the left, and a mild limp on the right side (although [Plaintiff] was able to walk unassisted)." (AR 19, 334-35.) Indeed, Dr. Enriquez found that Plaintiff had normal ranges of motion in all other joints, normal muscle tone and bulk without atrophy, normal strength without focal deficits, normal sensation, and normal reflexes. (AR 334.) A lack of supporting clinical findings was a specific and legitimate reason for rejecting part of Dr. Enriquez's opinion. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit physicians' opinions that

---

[7]    In support of her findings, Dr. Harar specifically noted (AR 371) a field-office staff member's observation that Plaintiff had no difficulty sitting or standing during an in-person interview (AR 95). An examining psychiatrist, Ernest A. Bagner, III, also noted that Plaintiff had normal posture and gait. (AR 348.)

are "conclusory, brief, and unsupported by the record as a whole
. . . or by objective medical findings"); Thomas v. Barnhart, 278
F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the
opinion of any physician . . . if that opinion is brief,
conclusory, and inadequately supported by clinical findings.").[8]

Finally, Drs. Harar and Chan both found that Plaintiff's
ability to stand and walk considerably exceeded Dr. Enriquez's
estimation — which was not justified by her objective findings —
further demonstrating that the ALJ's adoption of Dr. Gerber's
more limited view was legitimate and reasonable.  Thomas, 278
F.3d at 957 ("The opinions of non-treating or non-examining
physicians may also serve as substantial evidence when the
opinions are consistent with independent clinical findings or
other evidence in the record."); Morgan v. Comm'r of Soc. Sec.
Admin., 169 F.3d 595, 600 (9th Cir. 1999) ("Opinions of a
nonexamining, testifying medical advisor may serve as substantial
evidence when they are supported by other evidence in the record
and are consistent with it" (citing Andrews, 53 F.3d at 1041));
see 20 C.F.R. § 416.927(c)(4) (ALJ will generally give more
weight to opinions that are "more consistent . . . with the
record as a whole").  Dr. Gerber, unlike Dr. Enriquez, reviewed
all of the medical evidence before rendering his opinion.  See 20
C.F.R. § 416.927(c)(3) (in weighing medical opinions, ALJ "will

---

[8]     Other evidence in the record also showed that Plaintiff
could stand for longer than Dr. Enriquez found.  For example,
Robert Lindsey, the manager of the sober-living home where
Plaintiff had lived for five months, stated that although
Plaintiff's physical conditions affected his walking, they had no
impact on his ability to stand.  (AR 141.)

1   evaluate the degree to which these opinions consider all of the

2   pertinent evidence in [claimant's] claim, including opinions of

3   treating and other examining sources").   Moreover, the ALJ could

4   credit Dr. Gerber's opinion because he testified at the hearing

5   and was subject to cross-examination.   See Andrews, 53 F.3d at

6   1042 (greater weight may be given to nonexamining doctors who are

7   subject to cross-examination).   Any conflict in the properly

8   supported medical-opinion evidence was therefore the sole

9   province of the ALJ to resolve.   See id. at 1041.   Plaintiff is

10  not entitled to reversal on this ground.

11          B.   The ALJ Did Not Improperly Discount Plaintiff's

12               Subjective-Symptom Testimony

13       Plaintiff next argues that the ALJ improperly assessed his

14  subjective-symptom testimony in assessing his RFC.   (J. Stip. at

15  12-20.)

16          1.   Applicable law

17       An ALJ's assessment of pain severity and claimant

18  credibility is entitled to "great weight."   See Weetman v.

19  Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

20  F.2d 528, 531 (9th Cir. 1986).   When the ALJ finds a claimant's

21  subjective complaints not credible, the ALJ must make specific

22  findings that support the conclusion.   See Berry v. Astrue, 622

23  F.3d 1228, 1234 (9th Cir. 2010).   Absent affirmative evidence of

24  malingering, the ALJ must give "clear and convincing" reasons for

25  rejecting the claimant's testimony.   Lester, 81 F.3d at 834.   "At

26  the same time, the ALJ is not required to believe every

27  allegation of disabling pain, or else disability benefits would

28  be available for the asking, a result plainly contrary to 42

                                16

U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112

(9th Cir. 2012) (internal quotation marks and citation omitted).

If the ALJ's credibility finding was supported by substantial

evidence in the record, the reviewing court "may not engage in

second-guessing."  Thomas, 278 F.3d at 959.

2.  Relevant facts

In a July 2009 function report, Plaintiff stated that he

could walk "not very far" before having to rest for about an hour

and could pay attention for "not long."  (AR 118.)  He also

stated that he went outside every day, and when going out, he

traveled only by walking, not public transportation.  (AR 116.)

He alleged that his conditions affected his ability to lift,

squat, bend, stand, reach, walk, kneel, climb stairs, complete

tasks, concentrate, and understand.  (AR 118.)  Plaintiff said

that he had no problem performing personal care, following spoken

instructions, getting along with authority figures, or handling

stress and changes in routine.  (AR 114, 118-19.)  He said he was

able to pay bills and count change.  (AR 116.)  In a subsequent

undated Disability Report - Appeal, Plaintiff stated that he was

unable to stand for "long periods of time."  (AR 162.)

At the April 2011 hearing, Plaintiff testified that his legs

would start hurting if he stood for a while, specifying that he

could stand in one place for two or three hours and could stand

for about eight hours if he "really push[ed] it."  (AR 430, 433.)

He said he felt paranoid and depressed and had a bad memory but

could concentrate well.  (AR 431-32.)  In response to a question

by the VE, Plaintiff testified that he was unable to handle money

or make change.  (AR 434-35.)

17

As discussed in Section A, the ALJ found that as a result of his physical conditions, Plaintiff was limited to lifting 20 pounds occasionally and 10 pounds frequently; sitting for six hours of an eight-hour workday; standing or walking for four hours of an eight-hour workday; and only occasionally performing most postural activities but never climbing ladders, ropes, or scaffolds.  (AR 18.)  The ALJ also found that as a result of his mental condition, Plaintiff was limited to "simple tasks with simple work-related decisions," "never interact[ing] with the general public," and "only occasionally interact[ing] with co-workers and supervisors."  (AR 18.)  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that his statements "concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment."  (AR 21.)  As explained more fully below, the ALJ offered several clear and convincing reasons why this was so.

            3.   Analysis

As an initial matter, the ALJ's RFC finding largely accommodated Plaintiff's subjective complaints by limiting Plaintiff to, for example, only four hours of walking in a workday, occasional postural activities with no climbing, and simple tasks with limited social contact.  To the extent that Plaintiff's subjective symptom testimony was inconsistent with that RFC, however, the ALJ gave clear and convincing reasons for discrediting it.

First, the ALJ correctly noted that Plaintiff's testimony

18

and other statements contained inconsistencies:

. . . [Plaintiff's] allegations of generally disabling symptoms and limitations are not corroborated by the record.  In addition, [Plaintiff] has admitted that he has not always been compliant with his medication regimen.  Furthermore, while he testified he was unable to make change, both he (and Mr. Lindsey) have reported otherwise. [Plaintiff] has also indicated that he does not do household chores or use public transportation, although there is significant evidence to the contrary. Finally, the recent treatment history belies current claims of depression and paranoia.

(AR 21 (internal citations omitted).)  Indeed, in response to the VE's question at the hearing, Plaintiff testified that he was unable to handle money or make change.  (AR 434-35.)  Previously, however, Plaintiff and a third party, Robert Lindsey, the house manager at Plaintiff's sober-living house, had stated that Plaintiff was able to perform those tasks.  (AR 116 (Plaintiff's function report stating that he can pay bills and count change), AR 139 (third-party statement of Lindsey that Plaintiff could count change).)  In his function report, Plaintiff also indicated that his only form of transportation was walking, but the evidence established that he often also took public transportation.  (Compare AR 116 (Plaintiff's function report stating that he traveled only by walking) with AR 139 (statement of Lindsey that Plaintiff traveled by walking, public transportation, and riding bicycle), 349 (Plaintiff's statement to examining physician that he "takes the bus to get around").)

19

1   Those conflicts in Plaintiff's statements were permissible

2   reasons for discounting his credibility.  See Smolen v. Chater,

3   80 F.3d 1273, 1284 (9th Cir. 1996) (in determining credibility,

4   ALJ may consider claimant's prior inconsistent statements

5   concerning symptoms); Thomas, 278 F.3d at 958-59 (in determining

6   credibility, ALJ may consider inconsistencies in claimant's

7   testimony); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir.

8   1995) (ALJ permissibly discounted credibility based on

9   contradictions within claimaint's testimony).

10      Second, the ALJ properly noted that Plaintiff's "allegations

11  of generally disabling symptoms and limitations" were not

12  corroborated by the evidence of record.  (AR 21.)  Indeed, as the

13  ALJ found, Plaintiff's most recent medical records, from a parole

14  medical clinic, showed that his psychological symptoms were

15  stable and controlled when he took his medication.  (AR 21.)  For

16  example, on June 25, 2009, psychiatrist Gul Ebrahim noted that

17  Plaintiff was "stable" and taking his medication as prescribed;

18  Plaintiff reported that his medication "help[ed] him" with "his

19  mood and psychosis/paranoia."  (AR 407-08.)  On August 24, 2009,

20  however, Gamze Gurbuz, Ph.D., noted that Plaintiff reported

21  taking his medication only "every other day" and was "[m]ore

22  irritable and confused."  (AR 407.)  Gurbuz noted that

23  Plaintiff's lack of medication compliance was "apparent" and he

24  "[s]trongly encouraged" Plaintiff to take his medication.  (Id.)

25  On September 16, 2009, Gurbuz noted that Plaintiff was "taking

26  his full dose of medication" and was "more composed, stable."

27  (Id.)  In September, October, and November 2009, Dr. Ebrahim

28  noted that Plaintiff was stable on his medication and his

medication helped him.  (AR 406-07.)

On February 4, 2010, however, Dr. Ebrahim noted that Plaintiff was not taking his medication as prescribed and was paranoid and making nonsensical statements.  (AR 405.)  On February 10, 2010, Dr. Ebrahim noted that Plaintiff reported being a "little better" but still was not taking his medication as prescribed.  (Id.)  On February 18, 2010, Dr. Ebrahim noted that Plaintiff was compliant with medication but still psychotic; he increased Plaintiff's dosage.  (AR 404.)  By March 3, 2010, Dr. Ebrahim found that Plaintiff was compliant with his medication and had "no more voices and no more paranoia."  (Id.) Dr. Ebrahim noted that Plaintiff had improved on his current medication and advised him to continue them.  (Id.)  In March, April, May, June, and September 2010, Dr. Ebrahim continued to note that Plaintiff was medication compliant, his medications were helping him, and he was stable.  (AR 400-03.)  On November 8, 2010, moreover, psychiatrist Garret M. Halweg noted that Plaintiff had good medication compliance with no side effects, he was able to fully attend and concentrate, his memory was grossly intact for immediate, recent, and remote events, and he denied audio or visual hallucinations or paranoid delusions.  (AR 398-99.)  Thus, substantial evidence supports the ALJ's finding that Plaintiff's symptoms were controlled as a result of his "current, consistent adherence to his medication regimen."  (AR 21.)

The ALJ also discussed the findings of examining psychiatrist Ernest A. Bagner, III, CDC psychologist K. Nesson, and psychiatric consultant P.M. Balson, which were all consistent with Plaintiff's RFC and undercut his allegations of debilitating

psychological symptoms.  (AR 20-21.)  On January 13, 2009, Nesson found that Plaintiff had slight auditory hallucinations and slight paranoia at times but normal fund of information, intellectual functioning, concentration, attention, memory, thought processes, insight, and judgment.  (AR 227.)  On November 4, 2009, Dr. Bagner found that Plaintiff had average intelligence and tight thought processes, with no evidence of auditory or visual hallucinations or paranoid or grandiose hallucinations. (AR 349-50.)  Dr. Bagner opined that Plaintiff would have no limitations interacting with supervisors, peers, and the public; zero to mild limitations maintaining concentration and attention and completing simple tasks; mild limitations completing complex tasks; and mild to moderate limitations handling normal stresses at work and completing a normal work week without interruption. (AR 351.)  On December 1, 2009, Dr. Balson reviewed the evidence in Plaintiff's file and found that Plaintiff had a mood disorder that was "well managed via meds & sobriety."  (AR 359; see also AR 366 (noting that prison records showed diagnosis of bipolar disorder versus schizoaffective disorder that was "well managed on meds — relatively [symptom]/sign free").)  Dr. Balson opined that Plaintiff was not significantly limited in most areas but was moderately limited in his ability to understand, remember, and carry out detailed instructions; complete a normal work week without interruption from psychological problems; and respond appropriately to changes in the work setting.  (AR 352-53.)  Dr. Balson concluded that Plaintiff retained the RFC to perform simple, repetitive tasks in the open marketplace if he "maintains med[ication] adherence and sobriety."  (AR 354.)

Indeed, as the ALJ found, "[w]hile [Plaintiff] claims to have a bad memory, treating psychiatrists have found that his memory is grossly intact for immediate, recent, and remote events." (AR 18.)

Thus, the ALJ's detailed reasons for rejecting Plaintiff's testimony and other statements in total constituted appropriate bases for discounting Plaintiff's subjective-symptom testimony. See, e.g., Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (ALJ may infer that claimant's "response to conservative treatment undermines [claimant's] reports regarding the disabling nature of his pain"); Johnson, 60 F.3d at 1434 (holding that "contradictions between claimant's testimony and the relevant medical evidence" provided clear and convincing reasons for ALJ to reject plaintiff's subjective symptom testimony); Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008) (doctors' opinions finding plaintiff "could perform a limited range of work [] support the ALJ's credibility determination"); Doney v. Astrue, No. 11-35561, ___ F. App'x ___, 2012 WL 2584837, at *2 (9th Cir. July 5, 2012) (upholding ALJ's finding that plaintiff not credible regarding extent of impairments because plaintiff "provided contradictory statements and because her claims about the extent of her impairments were not supported by the objective medical record as a whole").

Plaintiff does not argue that the medical evidence supports his subjective-symptom testimony but instead incorrectly contends that the "rejection of a claimant's testimony based on a lack of objective evidence is always legally insufficient." (J. Stip. at 15.) An ALJ may not disregard a claimant's subjective-symptom

23

testimony "*solely* because it is not substantiated affirmatively by objective medical evidence." Robbins, 466 F.3d at 883 (emphasis added); see also Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991). The ALJ may, however, use the medical evidence in the record as one factor in his evaluation. See Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence"); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Kennelly v. Astrue, 313 F. App'x 977, 979 (9th Cir. 2009) (same). Here, as explained above, the ALJ's credibility determination was supported by other clear and convincing reasons; thus, there was no error.

This Court may not "second-guess" the ALJ's credibility finding simply because the evidence may have been susceptible of other interpretations more favorable to Plaintiff. See Tommasetti, 533 F.3d at 1039. The ALJ reasonably and properly discredited Plaintiff's testimony regarding the severity of his symptoms and gave clear and convincing reasons for his adverse credibility finding. Reversal is therefore not warranted on this basis.

**VII. CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four

of 42 U.S.C. § 405(g),[9] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: December 18, 2012

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[9] This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

25